IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:10-CV-00016-D

| | |
|---|---|
| KENNY A. ELAZZEH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the parties' cross motions for judgment on the pleadings. Claimant, Kenny A. Elazzeh, proceeding *pro se*, seeks judicial review of the Commissioner's denial of his applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). After a thorough review of the record and consideration of the briefs submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings [DE- 29] be denied and the Commissioner's Motion for Judgment on the Pleadings [DE- 32] be granted.

## STATEMENT OF THE CASE

Claimant protectively filed applications for SSI and DIB on August 21, 2006, alleging disability beginning October 1, 2002. (R. 116, 122.) The applications were denied initially (R. 49, 53) and upon reconsideration (R. 61, 70). Claimant then requested a hearing before an Administrative Law Judge ("ALJ") (R. 83), which took place on April 8, 2009 (R. 19). The ALJ issued a decision on June 11, 2009 denying Claimant's applications. (R. 9-18.) The Appeals Council denied Claimant's request for review on December 8, 2009 (R.1), which rendered the ALJ's decision a "final decision" for purposes of judicial review. *See Walls v. Barnhart*, 296 F.3d 287, 289

(4th Cir. 2002) (noting that when the Appeals Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal). On March 15, 2010, Claimant commenced this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

### I. The Standard of Review and Social Security Framework

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. § 405(g), is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *Walls*, 296 F.3d at 290; 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. *Walls*, 296 F.3d at 290. Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. 20 C.F.R. §§ 404.1520, 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the ALJ determines whether the claimant has a severe impairment or combination of impairments which significantly limit him or her from performing basic work activities. If no severe impairment is found, the claim is denied. If the

claimant has a severe impairment, at step three the ALJ determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled *per se*.

If the impairment does not meet or equal a Listing, at step four the claimant's residual functional capacity ("RFC") is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work. The Commissioner often attempts to carry his burden through the testimony of a vocational expert ("VE"), who testifies as to jobs available in the economy based on the characteristics of the claimant.

In this case, Claimant alleges the following errors by the ALJ: (1) failure to find that Claimant satisfied Listing 1.04; (2) consideration of Claimant's conservative treatment and perceived drug seeking behavior; (3) failure to properly weigh the medical opinions in assessing Claimant's RFC; and (4) failure to find that there were no jobs in the economy that Claimant could perform.

## II. The ALJ's Findings

The ALJ proceeded through the five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ first found that Claimant had not engaged in substantial gainful activity since October 1, 2002, the alleged onset date. (R. 11); *see* 20 C.F.R. §§ 404.1520(b), 416.920(b). The ALJ next found that Claimant suffered from the severe impairments of degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease, and

3

depression. (R. 11); *see* 20 C.F.R. §§ 404.1520(c), 416.920(c). However, at step three the ALJ determined that Claimant's impairments did not meet or medically equal a Listing. (R. 12); *see* 20 C.F.R. § 404.1520(d), (e), 416.920(d), (e). Next, the ALJ determined that Claimant had the RFC to perform less than a full range of light work with limitations. (R. 13.) At step four, the ALJ found that Claimant was unable to perform past relevant work. (R. 17); *see* 20 C.F.R. § § 404.1565, 416.965. The ALJ finally determined that there are jobs that exist in significant numbers in the national economy that Claimant could perform. (R. 17); *see* 20 C.F.R. §§ 404.1560(c), 416.960(c). As a result, the ALJ found that Claimant was not disabled from October 1, 2002 through the date of decision. (R. 18); *see* 20 C.F.R. §§ 404.1520(f)-(g), 416.920(f)-(g).

### III. The Administrative Hearing

#### A. Claimant's Testimony at the Administrative Hearing

Claimant testified to the following at the April 8, 2009 administrative hearing. (R. 21-44.) At the time of the hearing, Claimant was 46 years old, separated from his wife, and residing with his sister-in-law. (R. 24.) Claimant had completed four years of college and was a trained surveyor. (R. 25.) He had been unable to work since October 1, 2002 due to continuous pain. *Id.*

Claimant worked as a surveyor until 1991 or 1992. From 1993-2002 he owned a gas station with a restaurant. (R. 25-26.) He performed managerial and operational duties and cooked in the restaurant. (R. 26.) In 2003 when he became unable to stand for more than 10-15 minutes due to his back pain, he stopped working and sold the business. *Id.* In 2006, Claimant opened a retail bingo parlor. (R. 27.) He did not work in the bingo parlor, but provided direction by phone to an on site manager. *Id.* The bingo parlor was open for eight months and generated no income. (R. 27-28. In 2007, Claimant reopened the bingo parlor, which closed again after six months. *Id.* Claimant

4

has no current income and does not receive food stamps, but his sister-in-law provides him with some monetary assistance and he began receiving Medicaid in October 2007. (R. 28, 30.)

With respect to his inability to work, Claimant testified that in 2001 the pain in his back, which radiated down his left leg, began to gradually increase. (R. 29.) Even with medication, he could not stand or walk more than five minutes. *Id.* A CT scan taken in March 2002 revealed a pinched nerve and prompted a change in his medication. *Id.* His pain worsened to the point that he could not stand or sit. *Id.* He was given various medications and pain killers, but could not handle the pain. *Id.*

Between October 2002 and December 2003, Claimant was receiving treatment for his back pain in Jerusalem, Israel. (R. 30.) He did not have health insurance and received free treatment in Israel, and his wife, children, parents and siblings lived in Israel and could help care for him during treatment. *Id.* He would travel to Israel and stay for three months, then return to the United States for eight or nine months before returning to Israel for additional treatment. (R. 31.) Initially he was treated with medications, which did not cause negative side effects, shots in his back, and physical and water therapy. (R. 31, 38.) Subsequently, Claimant's dosage of pain killers was increased. (R. 31.) Claimant was told to follow-up with a pain clinic in the United States and did so at NOVA Pain Clinic ("NOVA"). (R. 32.)

While receiving treatment at NOVA, Claimant tested positive for morphine. (R. 35.) Claimant requested a retest because he believed that there was a mistake, but a second test on the same sample was again positive for morphine. *Id.* At the time Claimant was routinely taking oxycodone, Oxycontin, and Percocet, but was given hydrocodone at the hospital when he had an abscess removed from his back. *Id.* Claimant believes, based on his conversations with the lab, that

5

the positive morphine test was the result of him taking oxycodone, Percocet and hydrocodone in combination. *Id.* Due to the positive morphine test, Claimant left NOVA and began receiving treatment at Crystal Coast Pain Management ("Crystal Coast"). *Id.*

Between October 2002 and December 2003, Claimant's ability to walk was limited to within his house, and he could stand for no longer than five to ten minutes. (R. 32.) Standing or sitting was most painful, and lying down on his back or right side provided the most relief. (R. 32-33.) By the end of 2002, Claimant could not get out of bed without the assistance of a person on each side to lift him to a standing position, or he had to crawl from his bed to the floor and then attempt to stand. (R. 33.)

Claimant acknowledged his condition had improved "a little" since 2003. *Id.* At the time of the hearing, Claimant was taking three 60 milligram doses of Oxycontin per day. *Id.* The side effects from his medication included constipation, drowsiness, lack of concentration, depression, and decreased testosterone. (R. 37.) He is unable to do any household chores or cooking and has problems shaving and taking a shower due to his inability to stand up for any significant length of time. (R. 33, 36.) Claimant's routine consists of laying in bed, sometimes walking from his bed to the living room to lay on the couch and watch television, and sometimes surfing the internet on his computer for five or ten minutes. (R. 33.) Claimant stated that he was in pain sitting through the hearing and that the pain affected his ability to concentrate. (R. 37.)

In February 2009, Claimant underwent a discogram. (R. 29-30.) Claimant's neurosurgeon recommended surgery to replace two discs and fuse the S disc and predicted a 50/50 chance of improvement. (R. 34.) His doctors from Israel, including a neurosurgeon, orthopedic surgeon, and pain anesthesiologist, advised him last year not to have the surgery. *Id.* They reasoned, based on

6

the chance of success and risk involved, that he should not have surgery until he was unable to stand. *Id.* Claimant decided, based on the failure rate and potential need for multiple surgeries, not to have the surgery until he could no longer walk, and he was also concerned that the arthritis in one of his discs may be worsened by surgery. *Id.*

In addition to his back pain, Claimant developed depression in 2005 and began having breathing problems beginning sometime in 2006, which he described at the hearing as "getting worse as we speak." (R. 36.)

### B. Vocational Expert's Testimony at the Administrative Hearing

James Miller, a vocational expert ("VE"), testified at the administrative hearing. (R. 38-44.) The VE stated that Claimant had performed past work as (1) a surveyor, DOT code 018.167-038, light strength level, SVP 7, unskilled; and (2) a retail store manager, DOT code 185.167-046, light strength level, SVP 7, skilled. (R. 41.) The ALJ then posed the following hypothetical to the VE:

> Let's assume I have an individual with the same vocational history you've already described for this particular Claimant. Let's assume further that I find that the individual's limited from performing the following: lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently and would require a job that would allow a sit/stand option. Further would find that such individual could not work in environments with concentrated exposure to pollutants such as dust, fumes, and chemicals. With these restrictions, in your opinion, could such an individual perform any of the work that our Claimant has performed in the past?

*Id.*

The VE responded in the negative based on the need for a surveyor or retail store manager to stand for long periods of time. *Id.*

The ALJ next asked the VE if there were any jobs within the country that such an individual with the same work history as Claimant, a younger individual with a high school education, could

7

perform. (R. 41-42.) The VE responded that such an individual could perform the jobs of parking attendant, DOT code 915.473-010, light strength level, unskilled; surveillance monitor, DOT code 379.367-010, sedentary strength level, SVP 2, unskilled; and arcade attendant, DOT code 342.667-014, light strength level, unskilled. (R. 42.) The VE indicated that those jobs would allow the flexibility for sitting and standing. *Id.* He also explained that there were other light level jobs and significantly more sedentary level jobs that Claimant could perform. *Id.*

The ALJ then asked the VE to further restrict the hypothetical to no more than one or two step job instructions and no work around unprotected heights and dangerous moving equipment. (R. 43.) The VE responded that the additional restrictions would not change the previously identified occupational base. *Id.* Finally, the ALJ asked the VE to further restrict the hypothetical to an inability to attend to job tasks for two hour blocks of time because of pain. *Id.* The VE responded that the additional restriction would eliminate all work in the national economy. *Id.*

## IV. Claimant's Arguments

### A. Failure to Find that Claimant Satisfied Listing 1.04

The Claimant contends that the ALJ erred in concluding that he failed to meet or medically equal Listing 1.04. Claimant points to the following medical evidence in support of his contention: a CT scan dated March 8, 2003 indicating sciatica with severe nerve root irritation at L5/S1; an October 2006 exam indicating degenerative disc disease with left sciatica pain and impaired sensation of posterior aspect of the left thigh and left lower extremity down to the toes; a September 22, 2007 MRI indicating broad disk herniation at L5/S1 with resultant central stenosis; a May 10, 2008 medical record indicating L4/5 posterior central disc herniation compressing the thecal sac; and a February 6, 2009 discography indicating discogenic pain at L4-5 and L3-4. Claimant's Mem. in

Supp. at 1-2 [DE-30]. The ALJ specifically stated that she considered Listing 1.04 and that Claimant's "degenerative disc disease of the lumbar spine is not characterized by root compression, spinal arachnoiditis, or spinal stenosis" and, therefore, did not meet Listing 1.04. (R. 12.) She further stated that there are "no objective and credible medical findings based on medically acceptable clinical and laboratory techniques that show that a listing was met or equaled." *Id.*

An ALJ is required to "explicitly identify and discuss relevant listings of impairments where there is 'ample evidence in the record to support a determination' that an impairment meets or medically equals a listing." *Kelly v. Astrue*, No. 5:08-cv-289-FL, 2009 WL 1346241, at *5 (E.D.N.C. May 12, 2009) (quoting *Ketcher v. Apfel*, 68 F.Supp.2d 629, 645 (D. Md.1999)). The Fourth Circuit has previously found error where the "ALJ failed to identify the relevant listings and to explicitly compare the claimant's symptoms to the requirements of the listed impairments." *Johnson v. Astrue*, No. 5:08-cv-515-FL, 2009 WL 3648551, at *2 (E.D.N.C. Nov. 3, 2009) (citing *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986)). However, "[m]eaningful review may be possible even absent the explicit step-by-step analysis set out in *Cook* where the ALJ discusses in detail the evidence presented and adequately explains his consideration thereof." *Id.* (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). In this case, the ALJ's discussion of the evidence and explanation of her conclusions in her RFC assessment indicate that she sufficiently considered whether Claimant's back impairment met or equaled a Listing.

In the ALJ's RFC assessment, she thoroughly summarized Claimant's history of back pain, diagnoses, and the treatment he had received, including the MRIs and discogram that Claimant contends indicate that his back condition met or equaled Listing 1.04. (R. 14.) The ALJ also analyzed the consultative examination of Dr. Troutman and the medical opinion of Dr. Sneineh

9

regarding Claimants degenerative disc disease and explained that she gave them little weight because they were inconsistent with the objective medical evidence. (R. 14, 16.) Additionally, the Court finds that the medical records cited by Claimant indicate that he satisfied some but not all of the requirements of Listing 1.04. Claimant was diagnosed with the spinal disorders of degenerative disc disease (R. 195) and spinal stenosis (R. 300). However, his conditions do not satisfy all of the requirements of sections A, B, or C.

To satisfy Listing 1.04, Claimant must show a disorder of the spine "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" with one of the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> OR
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, Subpart P, App. 1, 1.04.

10

Case 4:10-cv-00016-D Document 34 Filed 02/10/11 Page 10 of 19

With regard to Listing 1.04A, the medical records demonstrate that Claimant has "L4/5 posterior central disc herniation compressing the thecal sac" (R. 299), "sciatica with severe nerve root irritation at L5/S1" (R. 297), "left sciatica pain" (R. 195), "impaired sensation of touch and pin prick sensation on the posterior aspect of the left thigh and left lower extremity down to the foot including the toes" (*Id.*), positive [s]traight leg raising on the left at 50 degrees (*Id.*), limited 70 degrees flexion of the thoracolumbar spine (*Id.*), and right and left lateral flexion limited to 15 and right and left rotation limited to 15 (*Id.*). However, the medical records do not demonstrate that Claimant has "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." 20 C.F.R. § 404, Subpart P, App. 1, 1.04A. An October 23, 2006 consultative exam indicated that the motor and sensory systems of the upper extremity were normal with a 1+ deep tendon reflex of the biceps and triceps bilaterally, normal motor function in the lower extremity, normal extension of the thoracolumbar spine, and a normal range of motion of the cervical spine. (R. 195.) Lower extremity motor examinations of Claimant on July 25, 2008, October 7, 2008, and January 5, 2009 were "grossly normal." (R. 264, 266 & 269.) Furthermore, while at times he had difficulty, Claimant could heel and toe walk, squat and rise, and stand on his toes. (R. 195, 280.) "Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. § 404, Subpart P, App. 1, 1.00E. Therefore, Claimant has failed to satisfy all the requirements of Listing 1.04A.

Listing 1.04B is not applicable because Claimant does not have a diagnosis of spinal arachnoiditis.

11

With regard to Listing 1.04C, the medical records reflect that Claimant has "broad disc herniation at L5/S1 with resultant central stenosis." (R. 300.) However, the medical records do not clearly show an "inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. § 404, Subpart P, App. 1, 1.04C. "Inability to ambulate effectively means an extreme limitation of the ability to walk" and "is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. § 404, Subpart P, App. 1, 1.00B.2.b. "[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

An October 23, 3006 consultative exam indicated that Claimant "can walk a few [yards]," "is unable to climb stairs," and "shows significant inability to walk," but "does not need or use an assistive device for ambulation." (R. 193-95.) However, an RFC assessment performed on December 6, 2006, and affirmed on April 25, 2007, indicated that Claimant could stand and/or walk for about six hours in a workday and climb stairs frequently. (R. 201-02, 253.) Claimant testified that his activity is limited to laying in bed, sometimes walking from his bed to the living room to lay on the couch and watch television, and sometimes surfing the internet on his computer for five or ten minutes. (R. 33.) However, he also testified that while he previously could not get out of bed

12

Case 4:10-cv-00016-D   Document 34   Filed 02/10/11   Page 12 of 19

without the assistance of two people and could only walk around his house, his condition had somewhat improved. (R. 32-33.) Dr. Hammonds's May 1, 2007 case notes, although focused on Claimant's depression, reflect that Claimant "continues to go out in public." (R. 254.) Finally, medical records from Crystal Coast indicated that Claimant had a normal gait and normal motor function in his lower extremity. (R. 264, 266 & 269.) Accordingly, it is not clear from the record that Claimant is unable to ambulate effectively, and thus Claimant has failed to satisfy all the requirements of Listing 1.04C.

The Court finds that the ALJ's conclusion that Claimant's degenerative disc disease did not meet or equal Listing 1.04 is supported by substantial evidence in the record and that her analysis was sufficient and not in error.

### B.  Consideration of Claimant's Conservative Treatment and Perceived Drug Seeking Behavior

Claimant contends that the ALJ erred in considering his failure to undergo surgery and his positive drug tests in concluding that his statements concerning the severity and limiting effects of his back impairment were not entirely credible. In assessing credibility, the ALJ must follow a two step process. First the ALJ must determine whether the claimant's medically determinable impairments could reasonably cause the alleged symptoms. *Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996). Next, the ALJ must evaluate the claimant's statements regarding those symptoms. *Id.* at 595. The Social Security rulings require that an ALJ's decision "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. "To the extent that

13

the ALJ detailed the relevant facts underlying his finding that Claimant's testimony was not fully credible, his credibility finding is entitled to substantial deference." *McLamb v. Astrue*, No. 5:08-CV-305-FL, 2009 WL 2046062, at *10 (E.D.N.C. July 14, 2009) (citing *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984)). Here, the ALJ determined that Claimant's statements regarding the effects of his impairments were not entirely credible based on, among other things, a conservative plan of treatment and drug seeking behavior.

### 1. Failure to Undergo Surgery

In making her credibility assessment, the ALJ considered that Claimant had been treated "very conservatively with pain medications, therapy, and injections" and had declined surgery that he had been advised might relieve his pain. (R. 15.) The type of treatment a claimant receives is one of the factors to be considered by the ALJ in assessing the credibility of subjective statements regarding pain. *Craig*, 76 F.3d at 595; *Grubby v. Astrue*, No. 1:09cv364, 2010 WL 5553677, at *5 (W.D.N.C. Nov. 18, 2010) (concluding that the ALJ properly considered *Craig* factors, including "the treatment plaintiff underwent to alleviate her pain and mental limitations, as he noted that plaintiff was offered surgery for her back, but declined the offer"). Accordingly, it was not error for the ALJ to consider Claimant's course of treatment, including his failure to undergo surgery, in her credibility determination.

### 2. Perceived Drug Seeking Behavior

In making her credibility assessment, the ALJ considered that Claimant had tested positive on at least two occasions for drugs that were not prescribed. (R. 15.) Claimant contends that there are legitimate explanations other than drug addiction to explain the positive drug tests and that the ALJ erred in considering and interpreting this evidence. "The type, dosage, effectiveness, and side

effects of any medication you take or have taken to alleviate your pain or other symptoms" is a factor relevant to evaluating a claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p (July 2, 1996). Evidence of drug seeking behavior is relevant to this inquiry. *See Kincaid v Astrue*, No. 4:07-CV-145-FL, 2008 WL 2891008, at *7 (E.D.N.C. July 25, 2008) (citing ALJ's consideration of, among other things, "evidence of drug-seeking behavior" as sufficient to support ALJ's credibility assessment). Furthermore, the ALJ did not rely solely on the positive drug tests, but also noted that Claimant had attempted, on two occasions within three days time, to obtain Oxycontin from Craven Regional Medical Center's express care. (R. 15.)

On June 25, 2008, Claimant's request for Oxycontin was denied because he had one week of medication remaining, and he was given a chronic pain referral. (R. 280.) On June 30, 2008, Claimant returned seeking a refill of his Oxycontin, which was again denied, and Claimant was informed that it was "not appropriate" to dispense Oxycontin from express care. (R. 276.) The doctor also noted that Claimant's back examination was "unremarkable." *Id.* The Court also notes that in December 2007, Dr. Sneineh characterized Claimant as "completely dependant" on pain killers. (R. 258.) Finally, after Claimant began treatment at Crystal Coast, he tested positive for hydrocodone that had not been prescribed for him, which Claimant explained was left from a previous prescription. (R. 262.) While there may be evidence in the record to support Claimant's contention that he did not exhibit drug seeking behavior, there is also substantial evidence to support the ALJ's conclusion. It is within the province of the ALJ to weigh the evidence, and her credibility assessments are entitled to substantial deference. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *McLamb*, 2009 WL 2046062, at *10. Accordingly, the Court finds that the ALJ did not err

15

Case 4:10-cv-00016-D   Document 34   Filed 02/10/11   Page 15 of 19

in considering what she perceived as drug seeking behavior in assessing the Claimant's credibility.

### C. Failure to Properly Weigh the Medical Opinions in Assessing Claimant's RFC

Claimant contends that the ALJ's RFC assessment is contradicted by the medical evidence in the record, specifically the medical opinions of Dr. Troutman and Dr. Sneineh. The ALJ concluded that Claimant can perform less that a full range of light work, lifting no more than 20 pounds, frequently lifting or carrying up to ten pounds, standing and/or walking for six hours, and sitting for up to six hours. She further restricted Claimant to jobs that allow for a sit or stand option as needed, avoid exposure to environmental pollutants, do not involve working around unprotected heights and dangerous moving equipment, and are limited to one and two step instructions. (R. 14.) The Court finds that the ALJ's RFC assessment was not in error.

Claimant first raises the October 23, 3006 consultative opinion of Dr. Troutman, which concluded that he had significant inability to stand or walk, lift or carry, or push or pull because of his lower back condition and that he would be limited by the side effects of the narcotics. (R. 195.) The ALJ noted that Dr. Troutman's examination indicated (1) that Claimant had no edema, no varicosities, and no hot, swollen, painful or ankylosed joints; (2) that Claimant had a normal range of motion in the cervical spine, 70 degrees flexion and normal extension in the thoracolumbar spine, and 15 degrees right and left lateral flexion and rotation; (3) that Claimant had a normal range of motion in his shoulders, elbows, wrists, hands, hips, knees, ankles, and feet; (4) that Claimant had a positive straight leg raising test at 50 degrees on the left; and (5) that although Claimant had some difficulty, he could heel and toe walk, squat and rise, and did not need or use an assistive device for ambulation. (R. 14.) The ALJ found Dr. Troutman's opinion inconsistent with his "minimal

16

findings" during his physical examination of Claimant, the conservative treatment Claimant received, and the fairly minimal findings on the MRIs and discogram. (R. 16.) She consequently gave his opinion little weight. *Id.* The ALJ must evaluate consultative opinions, but is not required to award them any heightened value. 20 C.F.R. §§ 404.1527(d), 416.927(d). Therefore, the Court finds that the ALJ properly evaluated Dr. Troutman's opinion.

Claimant next raises Dr. Sneineh's December 24, 2007 opinion that Claimant was not "physically fit or able to do any type of work as long as he is completely dependant on the antidepressant and pain killer drugs." (R. 258.) The ALJ found Dr. Sneineh's opinion not supported by the record and gave it little weight. (R.16.) She cited its inconsistency with the type and amount of treatment Claimant had received and the lack of evidence in the medical records to support Claimant's alleged side effects from medication. *Id.* The Court notes that during Dr. Souther's December 6, 2006 psychiatric review, Claimant stated that he "doesn't have any problems with concentration or attention" and that he had no side effects from his medication for depression. (R. 220.) Additionally, records from NOVA indicated that Claimant's pain was well controlled. (R. 222, 225, 227-29.) Even assuming Dr. Sneineh would be properly considered a "treating physician," his opinion as to the ultimate issue of Claimant's ability to work is not binding on the ALJ. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Accordingly, the Court concludes that the ALJ properly evaluated Dr. Sneineh's opinion.

The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p (July 2, 1996). The ALJ discussed and analyzed the evidence, including the Claimant's complaints of pain and other symptoms, and cited to medical records and evaluations

17

to support her conclusions. The Court also notes that the ALJ's RFC assessment is not inconsistent with Dr. Gardner's December 6, 2006 RFC assessment. (R. 200.) Accordingly, the ALJ properly assessed Claimant's RFC.

### D. Failure to Find That No Jobs Exist in the National Economy That Claimant Could Perform

Claimant contends, based on his physical restrictions and the side effects of his narcotic medications, that the ALJ erred in determining there were jobs in the national economy that he could perform. As discussed above, the ALJ found Claimant's statements about the severity and limiting effects of his back impairment not entirely credible. Consequently, the ALJ's hypothetical to the VE described an individual with fewer limitations than Claimant had described. Additionally, the VE testified that there were significantly more sedentary jobs than the three he described that an individual with the RFC and additional restrictions proposed by the ALJ could perform. (R. 43.)

Claimant also takes issue with the ALJ's statement that transferability of job skills is not material to the determination of disability in this case (R. 17). Under the Medical-Vocational Guidelines, for either sedentary or light work, based on Claimant's education level and age, he would be "not disabled" regardless of whether his job skills are transferrable. 20 C.F.R. § 404, Subpart P, App. 2, Rule 201.21, 201.22, 201.28, 201.29, 202.21 & 202.22. Accordingly, the ALJ was correct in finding that transferability of job skills was not material.

The Court finds no error in the ALJ's conclusion that there are jobs that exist in significant numbers in the national economy that Claimant could perform.

### CONCLUSION

The undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings be **DENIED** and that the Commissioner's motion for judgment on the pleadings is **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 10th day of February, 2011.

DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE